VERMONT SUPERIOR COURT
Washington Unit
65 State Street
Montpelier VT 05602
802-828-2091
www.vermontjudiciary.org

CIVIL DIVISION
Case No. 24-CV-00602



| Robert Dutil v. 1401 Marshfield LLC |
| --- |

## Opinion and Order on Mr. Dutil's Motion for Reconsideration

Plaintiff Robert Dutil claims that while on commercial property owned by Defendant 1401 Marshfield LLC ("Marshfield"), he slipped on ice in the parking lot, causing injuries. He sued Marshfield only. In its recent summary judgment decision, the Court explained that liability depends on who had control, not ownership, of the area where the injury occurred, and that the burden of proving who had control is on Mr. Dutil. The injury occurred in the parking area immediately in front of the tenant that Mr. Dutil had been visiting. The only substantial evidence in the record was the lease and excerpts of the deposition testimony of Marshfield's principal, Mr. Lucky Boardman. The Court analyzed the lease, which reserved the parking spaces in the disputed area for the tenant's exclusive use, and allocated responsibility for ice and snow removal in that area to that tenant. The Court noted that if there were any ambiguity in the lease, it was resolved by Mr. Boardman's testimony. Mr. Dutil did not attempt to come forward with any affidavits or other evidence disputing any allegedly undisputed facts or to demonstrate, for instance, that despite the lease terms, Marshfield in fact exercised control over the disputed parking area. To the extent that the latter issue was raised at all, he simply cited Mr. Boardman's own testimony, which the Court examined.

Mr. Dutil seeks reconsideration. He argues that the lease unambiguously designated the entire parking lot as a common area available to everyone. There are, in his view, no reserved spots for the tenant at issue. And, he argues, Mr. Boardman's testimony makes clear that Marshfield took care of ice and snow removal in the entire parking lot even if there were reserved spots for the tenant, or at least there is a dispute of fact as to that issue.

I.      Procedural Standard

"The standard for granting [a motion to reconsider] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Latouche v. North Country Union High School Dist.*, 131 F. Supp. 2d 568, 569 (D. Vt. 2001) (*quoting Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995)). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Id.*

II.     Analysis

The Court declines to revisit in any detail Mr. Dutil's argument that the lease unambiguously designates the entire parking lot as a common area, and there are no spots reserved for the tenant's use. The lease at ¶ 1 expressly includes parking spots reserved for the tenant's use. To the extent that the location of those spots in a sketch appended to the lease is unclear, Mr. Boardman's uncontested testimony as to their location is not. They were the parking spots immediately in front of the tenant's leased space. The Utilities and Services Rider is clear that responsibility for ice and snow removal in that location is allocated to the tenant.

The only question, then, is whether Marshfield exercised control in fact even though the lease allocated responsibility to the tenant. Mr. Dutil has the burden on that issue, and he came forward with no cogent evidence of it in opposition to summary judgment. The evidence that he argues the Court "overlooked" consists of certain testimony of Mr. Boardman. The Court recounts the relevant testimony at length:

Q. [I]s there anything in that lease with the post office that talks about maintenance of common areas, parking lots, things of that nature?

A. Yes.

Q. Tell me about that.

A. Obviously I didn't review it before today, but, to my knowledge, they're responsible for taking care of all their own parking maintenance and the purchased area, or leased area that they have, so it states in there that they're responsible for their leased area for maintenance.

Q. . . . . Help me describe what their leased area is according to the lease as you understand it.

A. It's the storefront width of their area . . ., so that's the area that they typically maintain.

. . .

Q. All right. And your understanding is the post office as a tenant of this property is responsible for maintenance, such as snow maintenance,—

A. Yes.

Q. —dirt, salting, things of that nature?

A. Yes.

Q. All right. *Having owned the property now for a couple of years, what is your understanding as to who actually does that work in their designated area that you described?*

A. *I have never seen I honestly do not know.* I have never seen a subcontractor there.

. . .

Q.     . . . . Does Vermont Rental Solutions handle the maintenance of all of your properties?

A.     We handle the management.

Q.     Okay.  So you don't know the name of the contractor or person or entity that plows and sands and salts over the last two years at 1401, but you can find that out?

A.     Yes.

Q.     And is it your understanding, having owned the property for two years, that that person or entity doesn't maintain the post office spaces?

A.     It—I would—he does not, he does not maintain the post office, to my knowledge, but because he maintains the whole lot, I'd imagine he, you know, his maintenance encompasses some of that, so my—I guess it's hard to answer that question.  He, to my knowledge, does not get paid to maintain the post office spot, but because it's a large parking lot, he maintains it for us, they might utilize his maintenance to do less of their own.

Q.     Okay.  I think—I appreciate the explanation.  So let me just break it down a little bit.  You say "he," so you know this is a—are you saying that just generally, or do you have someone in mind that you think does the work?

A.     I've met him.

Q.     Okay.

A.     I've met him.  I just can't recall his name I think it's—

.   .   .

Q.     So this individual, that you can't think of the person's name, your understanding over the last two years that you've owned 1401 is that he plows and maintains the area that both includes the common area at 1401 as well the designated area that the post office leases?

A.     Well, I wouldn't say he maintains theirs, because I don't know how that's supposed to work for them, but in maintaining our property, he has to pass through their designated area, so I would assume he would not lift his plow, and I would assume he would not stop his sander, so I, you know, I

would assume that he assists in their maintenance by just maintaining ours.

Q.    Okay.

A.    But I wouldn't say he maintains theirs.

Q.    Who maintains theirs, the post office, to your knowledge?

A.    I have no idea.

Q.    You have no idea.  All right.  In the month or so of your transition with the convenience store, you worked, you said you worked with a woman by the name of Missy [previous owner]?

A.    Yes.

Q.    And during that period of time did you observe her or anyone else maintaining the property?  When I say "maintaining," we're here to talk about parking lots and the like, so I'm not talking about plumbing upstairs or—

A.    Yeah.

Q.    Anything that you can recall?

A.    It's the same gentleman that we hired.  That's why I don't really remember his name.

Q.    Okay.

A.    We had just transitioned.

Q.    Okay.  And what generally did you observe this gentleman doing when you were onsite during this transition phase?

A.    I don't know if I recall him maintaining it when I was there, usually it's early, but I could say when I arrived the parking lot was always clean and sanded.

Q.    Okay.  And how many—so you observed what you perceived to be a well maintained parking lot during your transition; you're not sure when it occurred, but that was certainly your impression?

A.    Correct.

Q. And that included both snow removal as well as salt or sand, as you would have expected?

A. Correct.

Q. During this transition period did you have any conversations with Missy [former owner] about the post office or the common law parking lot and how things worked or needed to be done?

A. No. It was just a leased spot.

. . .

A. that was—when I asked them [former owners] if I'm sorry, they've ever maintained that area or if the post office maintained it, the post office is responsible for it, and I wanted to make sure that the border lines in the lease are correct, and they said yes.

Q. Okay. So I understand who might be responsible, but, but did Missy or Mr. Scribner [former owners] indicate to you that they had, in fact, maintained that designated area over the years?

A. No.

Q. Did they say that they didn't?

A. They said—I don't know if they said they didn't, but they said the post office was responsible.

Q. Okay. And the post office's responsibility includes the area that you saw Mr. Dutil stand up quickly on the morning of the incident?

A. Yes.

Q. Which is part of the parking area, correct?

A. Correct.

Boardman Deposition at 12–13, 15–18, 43 (emphasis added). When directly asked who actually clears snow and ice from the tenant's parking spots, Mr. Boardman said, "I have never seen I honestly do not know." Despite some speculation or equivocation, the rest of

his testimony does not fairly call that statement into question or otherwise indicate that Marshfield in fact exercised control over the disputed parking area.

The Court considered Mr. Boardman's testimony in its initial determination. The, as now, Mr. Dutil has the burden of proving who actually maintained the tenant's parking spots. Mr. Boardman's testimony could not reasonably support an affirmative finding by the jury to the effect that Marshfield did such work. Otherwise, the record is clear that the tenant had the responsibility to do so. Marshfield's motion for summary judgment required Mr. Dutil to come forward with that evidence, and he did not. *See Gallipo v. City of Rutland*, 163 Vt. 83, 86 (1994) (summary judgment will be granted if, after adequate time for discovery, a party fails to make a showing sufficient to establish an essential element of the case on which the party will bear the burden of proof at trial).

## Conclusion

For the foregoing reasons, Mr. Dutil's motion for reconsideration is denied.

Electronically signed on Monday, April 7, 2025, per V.R.E.F. 9(d).


_____
Timothy B. Tomasi
Superior Court Judge